## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| TSAWD HOLDINGS, INC., et al.,[1] | ) |
| | ) Case No. 16-10527 (MFW) |
| Debtors. | ) Jointly Administered |
| | ) |
| _____ | ) |
| | ) |
| TSA STORES, INC., TSA PONCE, | ) |
| INC., and TSA CARIBE, INC., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| and WILMINGTON SAVINGS FUND | ) Adv. No. 16-50364(MFW) |
| SOCIETY, FSB, AS SUCCESSOR | ) |
| ADMINISTRATIVE AND COLLATERAL | ) |
| AGENT, | ) |
| | ) |
| Plaintiff-Intervenor/ | ) |
| Counterclaim Defendant, | ) |
| | ) |
| v. | ) |
| | ) |
| M J SOFFE, LLC a/k/a M.J. SOFFE, | ) |
| LLC, | ) |
| | ) |
| Defendant/Counterclaim | ) |
| Plaintiff. | ) |
| _____ | ) |

### MEMORANDUM OPINION[2]

Before the Court is a Motion for Partial Judgment on the

Pleadings filed by Intervening Plaintiff, Wilmington Savings Fund

---

[1] The Debtors were formerly known as Sports Authority Holdings, Inc., et al.

[2] The Court is not required to state findings of fact or conclusions of law, pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.  Accordingly, the facts recited are those averred in the complaints and counterclaims, which must be presumed as true for the purposes of this motion.  Roberson v. Cityscape Corp. (In re Roberson), 262 B.R. 312, 318 (Bankr. E.D. Pa. 2001).

Society, FSB ("WSFS"), seeking a declaration that it has a
perfected security interest in the Debtors' inventory and sale
proceeds senior to that of M J Soffe, LLC ("Soffe") and seeking
disgorgement of the sale proceeds of that inventory.  For the
reasons set forth below, the Motion for Partial Judgment on the
Pleadings will be denied.

I.   <u>BACKGROUND</u>

     The Debtors marketed and sold sporting goods and active
apparel from retail stores located across the United States and
Puerto Rico under the name "Sports Authority."  The Debtors
obtained their inventory from vendors under various arrangements,
including consignment.  Soffe sold sporting goods and athletic
apparel to the Debtors for resale.  WSFS is a secured creditor of
the Debtors pursuant to prepetition term loan credit and security
agreements, under which WSFS was granted a security interest in,
<u>inter alia</u>, the Debtors' inventory.

     On March 2, 2016, the Debtors commenced their chapter 11
cases.  On March 16, 2016, the Debtors commenced this adversary
proceeding against Soffe, seeking,[3] <u>inter alia</u>, declaratory

_____

        [3]     The Debtors' complaint specifically seeks: (1) a
declaration that the Debtors hold an interest senior in right and
priority to that of Soffe; (2) the avoidance of a preferential
transfer pursuant to section 547(b) of the Bankruptcy Code; (3)
recovery of the transfer pursuant to section 550 of the
Bankruptcy Code; (4) disallowance of Soffe's claims; (5)
injunctive relief prohibiting Soffe from inhibiting or preventing

relief in connection with competing claims to certain inventory in the Debtors' possession pursuant to a Pay by Scan Agreement and to the sale proceeds resulting therefrom (the "Disputed Proceeds"). (Adv. D.I. 1.) The inventory in dispute consists of approximately $5,421,528 of goods shipped and delivered prepetition by Soffe to the Debtors (the "Disputed Goods"). Id.

On May 3, 2016, the Court entered a final Order in the Debtors' main case authorizing the Debtors to sell consigned goods in the ordinary course of business so long as the Debtors complied with their prepetition agreements, including remitting part of the sale proceeds to consignment vendors (the "Final Consignment Order"). (D.I. 1704.) The Debtors agreed to this procedure when the Court refused to otherwise let the Debtors sell the Disputed Goods until the Court could determine the competing interests in the consigned goods and proceeds therefrom in the adversaries. (D.I. 175.) See In re Whitehall Jewelers Holdings, Inc., No. 08-11261 (KG), 2008 WL 2951974, at *6 (Bankr. D. Del. July 28, 2008) (holding that issues regarding ownership of prepetition consigned goods and interrelated issues regarding the existence, perfection, and/or priority of any security interest in those goods can only be resolved in an adversary

---

the Debtors from selling consigned goods in the ordinary course of business; (6) damages recoverable at law or in equity; (7) pre- and post-judgment interest; and (8) costs, disbursements and attorneys' and experts' fees. (Adv. D.I. 1.) Similar complaints were filed against other vendors.

proceeding, not a section 363 sale).  The Final Consignment Order explicitly provides that the Disputed Proceeds, together with interest, are subject to disgorgement.[4]  (D.I. 1704.)

WSFS filed a motion to intervene in the adversary proceeding which was granted and filed a complaint against Soffe seeking a declaration that WSFS has a perfected security interest senior to Soffe's interest in the Disputed Goods and seeking disgorgement of the Disputed Proceeds.  (Adv. D.I. 17.)  WSFS's asserted claim is premised on its role as successor agent under a 2006 Term Loan Credit Agreement, as amended and restated on November 16, 2010, under which several of the Debtors are obligated as either borrower or guarantor.[5]  Id.  WSFS asserts a security interest in the Debtors' inventory pursuant to a Term Loan Security Agreement (the "WSFS Security Agreement") and financing statement.  WSFS's alleged secured debt totaled $276.7 million in principal as of the petition date.  Id.

On June 30, 2016, Soffe filed an Answer to WSFS's Complaint and counterclaimed for a declaration that any security interest

---

[4]     Several vendors, including Soffe, appealed the Final Consignment Order contending that the Court exceeded its authority in pre-determining remedies, including disgorgement and the imposition of liens. (D.I. 2018.)  On December 14, 2016, the District Court stayed the appeal at the request of the parties, pending this Court's ruling on the motions for judgment.  In re Sports Authority Holdings, Inc., Case No. 1:16-cv-00382-SLR.

[5]     The borrowers or guarantors are Slap Shot Holdings, Corp., TSAWD, Inc., TSA Stores, Inc., and TSA Gift Card, Inc. (Adv. D.I. 17.)

WSFS purports to have in the Debtors' inventory does not attach
to the Disputed Goods and that, to the extent it is determined
that WSFS has a lien on the Disputed Goods, such lien is
subordinate to Soffe's interest.  (Adv. D.I. 27 at ¶¶ 89, 96.)

On July 19, 2016, WSFS filed the instant Motion for Partial
Judgment on the Pleadings.  (Adv. D.I. 34.)  A notice of
completion of briefing on that motion was filed on August 17,
2016, and the matter is now ripe for decision.  (Adv. D.I. 40.)

II.  <u>JURISDICTION</u>

Soffe asserts that the Court does not have subject matter
jurisdiction over WSFS's complaint and Soffe's counterclaims,
contending that they are non-core claims raised by non-debtor
parties.  Soffe does not consent to entry of any final order or
judgment by the Court.

WSFS, however, asserts that the Court has jurisdiction over
the instant adversary proceeding, which is a core proceeding
because it requires a determination of the validity, extent, and
priority of liens on property of the estate.  28 U.S.C. §
157(b)(2)(K).  WSFS additionally contends that the Court has
jurisdiction because the adversary proceeding is premised on the
enforcement and interpretation of the Final Consignment Order.
<u>See, e.g.</u>, <u>Travelers Indem. v. Bailey</u>, 557 U.S. 137, 151 (2009)
(observing that a bankruptcy court has jurisdiction to interpret

and enforce its own prior orders); <u>In re Lazy Days' RV Ctr.,</u>
<u>Inc.</u>, 724 F.3d 418, 423 (3d Cir. 2013) (same).

In determining the scope of the Court's jurisdiction over
this adversary proceeding, the Court must conduct a two-part
inquiry: it must determine first whether the Court has subject
matter jurisdiction and second, whether the Court has authority
to enter a final judgment.  <u>See, e.g.</u>, <u>Liquidating Tr. of the MPC</u>
<u>Liquidating Trust v. Granite Fin. Solutions, Inc. (In re MPC</u>
<u>Computers, LLC)</u>, 465 B.R. 384, 389 (Bankr. D. Del. 2012) ("The
question pondered by the Supreme Court in <u>Stern</u>, whether the
bankruptcy judge had the power to enter a final judgment in a
state law counterclaim by the estate, is entirely separate from
the question of whether a bankruptcy judge has jurisdiction to
hear a matter without entering final judgment.").

The Court's subject matter jurisdiction is derived from
section 1334 of title 28, which establishes the district court's
bankruptcy jurisdiction, and the Amended Standing Order of
Reference, which then refers "any or all cases under title 11 and
any or all proceedings arising under title 11 or arising in or
related to a case under title 11 . . . . to the bankruptcy judges
for this district."  <u>See</u> 28 U.S.C. § 157(a).  Thus, to the extent
that the adversary proceeding arises under or in a case under
title 11, or is related to a case under title 11, the Court has
subject matter jurisdiction to hear the same.  <u>See, e.g.</u>, <u>Burtch</u>

6

v. Huston (In re USDigital, Inc.), 461 B.R. 276, 283 (Bankr. D. Del. 2011) ("Stern in no way limits the bounds of a bankruptcy court's subject matter jurisdiction.  At the very least the bankruptcy court must have 'related to' jurisdiction.").

Proceedings arising under title 11 and arising in cases under title 11 are both generally referred to as "core" proceedings.  28 U.S.C. § 157(b); Stern v. Marshall, 564 U.S. 462, 476 (2011) ("Under our reading of [28 U.S.C. § 157(b)], core proceedings are those that arise in a bankruptcy case or under title 11.  The detailed list of core proceedings in § 157(b)(2) provides courts with ready examples of such matters."); Stoe v. Flaherty, 436 F.3d 209, 216 (3d Cir. 2006) (citing In re Combustion Eng'g, Inc., 391 F.3d 190, 225 (3d Cir. 2005)). Proceedings arising under title 11 involve express provisions of the Bankruptcy Code, while proceedings arising in a case under title 11 refer to proceedings that are not based on any right expressly created by the Bankruptcy Code, but nevertheless would have no existence outside the bankruptcy case.  See Stoe, 436 F.3d at 218 ("[C]laims that 'arise in' a bankruptcy case are claims that, by their nature, not their particular factual circumstances, could only arise in the context of a bankruptcy case."); Seagate Tech. (US) Holdings, Inc. v. Global Kato HG, LLC (In re Solyndra, LLC), No. 11-12799 (MFW), 2015 WL 6125246, at *3 (Bankr. D. Del. Oct. 16, 2015) (same).

7

It is well-settled that proceedings "arising in" bankruptcy include those requiring determinations of the validity, extent or priority of liens on property of the estate.  28 U.S.C. § 157(b)(2)(K).  See, e.g., Stoe, 436 F.3d at 216; Nelson v. Welch (In re Repository Techs., Inc.), 601 F.3d 710 (7th Cir. 2010).  See also 1-3 COLLIER ON BANKRUPTCY ¶ 3.01[3][e][iv] (16th ed. rev. 2012).  A plain reading of section 157(b) therefore provides the statutory authority for the Court to hear the instant adversary proceeding as a core proceeding because the parties seek a determination of the extent and priority of WSFS's lien on the Debtors' inventory.

Post-Stern, however, the Court must also determine whether Article III prohibits the Court from entering a final order in the adversary proceeding.  See Stern, 564 U.S. at 468 (finding that the bankruptcy court had statutory authority to enter judgment on the bankruptcy estate's state law counterclaim, but lacked constitutional authority to do so).

The bankruptcy court has constitutional authority to enter final judgment if "the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process."  Stern, 564 U.S. at 499.  The claims and counterclaims at issue here, while dependent on state law, are integral to the allowance of the claims of both WSFS and Soffe against the Debtors and their estates.  By contrast, Stern involved a

8

nondischargeability proceeding in which the debtor raised a tortious interference counterclaim which the Supreme Court found was entirely unrelated to the claims allowance process. <u>Stern</u>, 564 U.S. at 499.  The Court therefore finds the facts of <u>Stern</u> to be readily distinguishable from the case at bar.

Accordingly, the Court concludes that Article III does not limit the Court's authority to enter final judgment on the claims and counterclaims at issue in the adversary proceeding.[6]

## III.  <u>DISCUSSION</u>

### A.  <u>Standard of Review</u>

Pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, as incorporated by Rule 7012 of the Federal Rules of Bankruptcy Procedure, a party may move for judgment on the pleadings "[a]fter the pleadings are closed but early enough not to delay trial." FED. R. CIV. P. 12(c); FED. R. BANKR. P. 7012.  A Rule 12(c) motion will be granted where the movant clearly

---

[6]     Soffe has also demanded a jury trial.  (Adv. D.I. 18.) This, however, does not prevent the Court from deciding the issues raised by WSFS's motion for judgment on the pleadings which deal with the allowance and priority of claims.  <u>See, e.g.</u>, <u>MCI WorldCom Commc'ns, Inc. v. Commc'ns Network Int'l, Ltd. (In re WorldCom, Inc.)</u>, 378 B.R. 745, 752 (Bankr. S.D.N.Y. 2007) ("There is no right to a jury trial as to any issue bearing directly on the claims-allowance process, such as a determination as to the validity of a creditor and the creditor hierarchy, because the legal issue has been converted into an equitable issue.") (citing <u>Germain v. Conn. Nat'l Bank</u>, 988 F.2d 1323, 1329 (2d Cir. 1993)).

establishes that no material issue of fact remains to be resolved and that the movant is entitled to judgment as a matter of law. Perez v. Griffin, 304 F. App'x 72, 74 (3d Cir. 2008).  In making this determination, the Court must view the factual allegations in the pleadings and inferences to be drawn therefrom in the light most favorable to the non-moving party.  Id.  The Court may also consider documents integral to or explicitly relied upon in the pleadings.  See Mele v. Fed. Reserve Bank of N.Y., 359 F.3d 251, 256 n.5 (3d Cir. 2004).

WSFS asserts that pursuant to its security interest in the Debtors' inventory, it has an interest in the Disputed Goods under the Uniform Commercial Code ("UCC")[7] which is superior to any interest that Soffe has.  Soffe asserts that Article 9 is not applicable to the competing interests in the Disputed Goods and that, even if it did, WSFS's interest never attached to the Disputed Goods.

B.  Consignments under the UCC

"Consignments of personal property are, for the most part, governed by Revised Article 9 of the Uniform Commercial Code, which distinguishes between consignments that satisfy the

---

[7]    The Pay by Scan Agreement specifies that the Colorado and Delaware versions of the UCC apply.  The applicable provisions discussed here are the same as enacted in Colorado and Delaware.  Therefore, citations to the Delaware UCC (Del. Code Ann. tit. 6, § 9-101, et seq. (2016)) also refer to the Colorado UCC (Colo. Rev. Stat. § 4-9-101, et seq.(2016)), unless otherwise indicated.

definition contained in [section] 9-102(a)(20) and those that do
not." 5-541 COLLIER ON BANKRUPTCY ¶ 541.05. Consignments that
satisfy the UCC definition require perfection in accordance with
the UCC. <u>See</u> <u>Id.</u> <u>See also</u> Del. Code Ann. tit. 6, § 9-109(a)(4),
cmt. 6 (stating that "Article [9] applies to every 'consignment'"
to the extent the consignment meets the definition under section
9-102(a)(20)). Consignments that do not satisfy the UCC
definition are governed by state common and statutory law. 5-541
COLLIER ON BANKRUPTCY ¶ 541.05. <u>See</u> Del. Code Ann. tit. 6, § 9-
319(b). Soffe argues that the arrangement between it and the
Debtors does not qualify as an Article 9 consignment.

1.   <u>Sections 9-102 and 9-319 of the UCC</u>

Section 9-102(a)(20) of the UCC defines "consignment" in the
conjunctive as a "transaction, regardless of its form, in which a
person delivers goods to a merchant for the purpose of sale" and:

> (A) the merchant:
>     (i) deals in goods of that kind under a name
>     other than the name of the person making the
>     delivery;
>     (ii) is not an auctioneer; and
>     (iii) is not generally known by its creditors
>     to be substantially engaged in selling the
>     goods of others.
> (B) with respect to each delivery, the aggregate value
> of the goods is $1,000 or more at the time of delivery;
> (C) the goods are not consumer goods immediately before
> delivery; and
> (D) the transaction does not create a security interest
> that secures an obligation.

<u>Id.</u> § 9-102(a)(20).

If the consignment meets the UCC definition, the consignor obtains a purchase money security interest ("PMSI") in the consigned goods and retains title. Id. § 9-103(d); In re Valley Media, Inc., 279 B.R. 105, 115 (Bankr. D. Del. 2002). To maintain priority in the consigned goods, however, the consignor must perfect its PMSI prior to the delivery of the goods. See Del. Code Ann. tit. 6, § 9-324(b) (To perfect its PMSI, a consignor must file a UCC financing statement and deliver an authenticated notification to secured creditors of the consignee within five years before the debtor obtains possession of the inventory, stating that the consignor has or expects to acquire a PMSI in described inventory.) A perfected consignor's PMSI qualifies as an exception to the "first in time, first in right" rule. See generally id. § 9-317.

To the extent the consignor fails to timely perfect its PMSI, however, the consigned goods are subject to competing claims of other secured creditors of the consignee and priority is determined by reference to the UCC. See Valley Media, 279 B.R. at 123, n.30.

Section 9-319(a) provides that, "for purposes of determining the rights of a creditor of . . . a consignee, while the goods are in possession of the consignee, the consignee is deemed to have the rights and title to the goods identical to those the consignor had or had power to transfer." Del. Code Ann. tit. 6,

12

§ 9-319.  That is, the consignee can grant a security interest in the goods to another creditor who would have an interest superior to that of a consignor.  The Official Comments to section 9-319 expressly contemplate such a situation:

> SP-1 obtains a security interest in all Debtor's existing and after-acquired inventory.  SP-1 perfects its security interest with a proper filing.  Then SP-2 delivers goods to Debtor in a transaction constituting a "consignment" as defined in Section 9-102.  SP-2 files a proper financing statement but does not send notification to SP-1 under Section 9-324(b).  Accordingly, SP-2's security interest is junior to SP-1's under Section 9-322(a).  Under Section 9-319(a), Debtor is deemed to have the consignor's rights and title, so that SP-1's security interest attaches to SP-2's ownership interest in the goods.

Id. § 9-319, cmt. 3 (emphasis added).

An unperfected consignor may, however, prevent the application of section 9-319(a) if it can prove, by a preponderance of the evidence, that the transaction is not governed by Article 9 because the consignment does not fit the UCC definition.  See Gary D. Spivey, Annotation, Consignment Transactions Under Uniform Commercial Code Article 9 on Secured Transactions, 58 A.L.R. 6th 289 (2010) ("[T]he UCC provision subordinating the consignor's security interest does not apply if the transaction does not satisfy the statutory definition of a 'consignment,' as where it is shown that the consignee was 'generally known' by its creditors to be substantially engaged in selling the goods of others.").

13

WSFS argues that its floating lien in the Debtors' inventory attached to the Disputed Goods and is superior to any interest Soffe may have in those goods.  It specifically argues that its interest is superior because Soffe never perfected a security interest in the Disputed Goods.

Soffe counterclaims that WSFS does not have a superior interest in the Disputed Goods because Article 9 of the UCC is not applicable.  Soffe argues that the arrangement it had with the Debtors does not fit the UCC definition of a consignment because the Debtors were generally known by their creditors to be substantially engaged in selling the goods of others and because WSFS had actual knowledge of the consignment arrangement, an exception recognized by Colorado law.  Del. Code Ann. tit. 6, § 9-102(a)(20).  See also, Europac Serv., Inc. v. Repub. Acceptance Corp., 37 P.3d 447, 450-51 (Colo. App. 2000) (finding that a creditor with actual knowledge of a consignment arrangement cannot benefit from section 9-319 of the UCC); GBS Meat Indus. Pty. Ltd. v. Kress-Dobkin Co., 474 F. Supp. 1357, 1363 (W.D. Pa. 1979), aff'd without opinion at 622 F.2d 578 (3d Cir. 1980) (holding that a consignor has priority over a secured creditor with actual knowledge of the consignment relationship because any other result would sanction the intentional conversion of goods). But see Valley Media, 279 B.R. at 123 (recognizing the split of authority on the actual knowledge exception).

14

WSFS argues, however, that Soffe is precluded from arguing that the transaction is not an Article 9 consignment as defined by section 9-102(a)(20) because the Pay by Scan Agreement expressly provides that the "arrangement shall qualify as a consignment under section 9-102(a)(20) of both the Colorado and Delaware versions of the UCC."  (Adv. D.I. 35; Adv. D.I. 38.)

    2.  <u>Section 1-302 of the UCC</u>

Section 1-302 of the UCC permits parties to vary <u>the effect</u> of the UCC's provisions by agreement but not to alter the meaning of <u>defined terms</u>.  Del. Code Ann. tit. 6, § 1-302(a); <u>id.</u> § 1-302, cmt. 1  ("The meaning of a statute itself must be found in its text, including its definitions, and in appropriate extrinsic aids; it cannot be varied by agreement.").

The Official Comments to section 1-302 specifically provide that parties may vary by agreement the effect of the UCC by "stating the rules that will govern in lieu of the provisions varied. . . . [or] by stating that their relationship will be governed by recognized bodies of rules or principles applicable to commercial transactions [such as UNCITRAL or Unidroit]."  <u>Id.</u> § 1-302, cmt. 2.  The UCC therefore permits parties to a commercial transaction to opt out of the UCC and designate an alternative body of rules to govern their contract.  <u>See generally</u> 1B DAVID FRISCH, LAWRENCE'S ANDERSON ON THE UNIFORM COMMERCIAL CODE § 1302 (3d. ed. 2015) (explaining that parties may contract

15

to take a transaction out of coverage of the UCC).

In contrast, the UCC limits the contracting parties' ability to define their legal relationship as within the UCC's ambit by changing the UCC's definitions, reflecting the reality that only a legislative amendment can vary the statute itself. See, e.g., Del. Code Ann. tit. 6, § 1-302, cmt. 1 ("[P]rivate parties cannot make an instrument negotiable within the meaning of Article 3 except as provided in Section 3-104; nor can they change the meaning of such terms as 'bona fide purchaser,' 'holder in due course,' or 'due negotiation,' as used in the Uniform Commercial Code.").

In the instant case, the Court concludes that the Pay by Scan Agreement's statement that the "arrangement shall qualify as a consignment under section 9-102(a)(20)[of the UCC]" implicitly deems the Debtors a "merchant," a defined term within the UCC. If, however, the Debtors were generally known to be selling the goods of others or WSFS knew the Disputed Goods were sold to the Debtors on consignment, as Soffe contends, then the Debtors were not merchants, and the Pay by Scan Agreement impermissibly changes the UCC definitions of consignment and merchants. See id. § 9-102(a)(20). See, e.g., Italian Designer Import Outlet, Inc. v. New York Cent. Mut. Fire Ins. Co., 891 N.Y.S.2d 260 (N.Y. Sup. Ct. 2009) (holding that, notwithstanding the governing "consignment agreement," the transaction did not qualify as a

true consignment under the Article 9 definition for purposes of determining insurance coverage).

While WSFS correctly notes that parties have an interest in obtaining certainty with respect to the treatment of their transactions under the law and are generally free to regulate their contractual relationships as they see fit, the "principle of freedom to contract is subject to specific exceptions found elsewhere in the Uniform Commercial Code" and specifically to the UCC's definitions.  Del. Code Ann. tit. 6, § 1-302, cmt. 1. Thus, WSFS's argument (by analogy) to the enforceability of contractual forum-selection clauses, choice of law provisions, and reduced statute of limitation periods[8] is inapposite.

WSFS argues that this conclusion makes the designation in the Pay by Scan Agreement superfluous in a manner inconsistent with traditional judicial canons.  See, e.g., iBio, Inc. v. Fraunhofer USA, Inc., C.A. No. 10256-VCMR, 2016 WL 4059257, at *10 (Del. Ch. July 29, 2016) ("Contractual interpretation operates under the assumption that the parties never include superfluous verbiage in their agreement, and that each word

---

[8]    See, e.g., Atl. Marine Constr. Co. v. United States Dist. Court, 134 S. Ct. 568, 582 (2013) (citing The Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 17-18 (1982)) (enforcing forum-selection clause); Gen. Motors Corp. v. New AC Chevrolet, Inc., 263 F.3d 296, 331 (3d Cir. 2001) (enforcing choice of law provision); Grant Family Farms, Inc. v. Colo. Farm Bureau Mut. Ins. Co., 155 P.3d 537, 539 (Colo. App. 2006) (enforcing agreement to shorten applicable statute of limitations).

should be given meaning and effect by the court.").

The Court disagrees because it cannot enforce a contractual provision that is inconsistent with the requirements of the UCC. Cf. In re SemCrude, L.P., 399 B.R. 388, 398 (Bankr. D. Del. 2009), aff'd, 428 B.R. 590 (D. Del. 2010) (holding that non-mutual debts could not be transformed into a "mutual debt" under section 553 of the Bankruptcy Code simply because a multi-party agreement allowed for setoff of non-mutual debts between the parties to the agreement).

WSFS also argues that Soffe is estopped from contesting the applicability of Article 9 to the Pay by Scan Agreement.  The Court rejects this argument for the same reason: the Court cannot enforce a contractual term prohibited by the UCC based on principles of equity.  See Dave Greytak Enters., Inc. v. Mazda Motors of Am., Inc., 622 A.2d 14, 22 (Del. Ch. 1992), aff'd, 609 A.2d 668 (Del. 1992) (noting that the court's equitable power to fashion appropriate remedies presupposes the existence of an enforceable right).

Accordingly, the Court will deny the Motion for Partial Judgment on the Pleadings because there is a disputed issue of fact: whether the Pay by Scan Agreement is a consignment under Article 9.

C.    <u>Attachment of WSFS's Security Interest</u>

WSFS's Motion for Partial Judgment on the Pleadings seeks a declaration that WSFS has a perfected security interest in the Disputed Goods and the sale proceeds therefrom, which is superior to Soffe's interest.  Soffe contends, however, that whether the priority of interests in the Disputed Goods is governed by the UCC or state law, Soffe's interest is superior to WSFS's because the Debtors did not grant WSFS a security interest in the Disputed Goods in the first instance.

Under section 9-203(b) of the UCC, a security interest is enforceable with respect to collateral if "(1) value has been given; (2) the debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party; [and] (3) . . . (A) the debtor has authenticated a security agreement that provides a description of the collateral . . . ."  N.Y. UCC, § 9-203(b).[9]

Soffe admits that subsection (b)(2) would be satisfied by the legal fiction of section 9-319(a) of the UCC, pursuant to which the Debtors would be deemed to have rights in the Disputed Goods that may be transferred to a secured party, if the UCC is found to be applicable.  <u>See</u> Part B <u>supra</u>.  Soffe contends, however, that even if the UCC is applicable, section 9-319(a) is

---

[9]    Unlike the Pay by Scan Agreement, the WSFS Security Agreement is governed by New York law.  (Adv. D.I. 35 at ¶ 54 n.12.)

merely an enabling provision that permits satisfaction of one requirement of section 9-203(b) and plays no further role in the dispute.  In other words, Soffe contends that while section 9-319(a) gives a debtor the power to transfer rights in the collateral to a secured party, it is irrelevant for purposes of determining the secured party's actual rights in the collateral. Instead, Soffe argues that WSFS does not have an enforceable security interest in the Disputed Goods because the other requirements of section 9-203(b) are not satisfied.

Soffe argues that subsections 9-203(b)(1) and (b)(3)(A) are not satisfied because (1) the language of the WSFS Security Agreement did not grant WSFS a security interest in the Disputed Goods and (2) WSFS did not lend against the Disputed Goods and therefore did not provide value.

First, Soffe contends that the description of collateral in the WSFS Security Agreement conflicts with the description of collateral in WSFS's financing statement and that the narrower description of collateral in the latter controls.  See, e.g., In re Amex-Protein Dev. Corp., 504 F.2d 1056, 1058-59 (9th Cir. 1974) (recognizing that the description of collateral in a financing statement may have the effect of restricting the security interest created in a security agreement but cannot enlarge it); In re Holladay House, Inc., No. 3:08cv286, 2008 WL 4682770, at *3 (E.D. Va. Oct. 21, 2008) (holding that a financing

statement using a narrow description of collateral, referencing only inventory delivered pursuant to a particular consignment and security agreement, compared to the broader collateral description used in the related consignment and security agreement, resulted in a perfected security interest in the inventory described in the financing statement only); Georgia-Pacific Corp. v. Lumber Prods. Co., 590 P.2d 661, 664 (Okla. 1979) (limiting creditor's security interest to "assignment accounts receivable" as described in the financing statement notwithstanding the security agreement's description of collateral as "all accounts receivable").

WSFS, however, argues that the cases on which Soffe relies are distinguishable because they involve descriptions in financing statements providing specific limitations on categories of collateral. WSFS contends that no such limitation exists in this case because WSFS's financing statement broadly describes its collateral as: "[a]ll assets of the Debtor, whether now owned or hereafter acquired, including all products, proceeds, substitutions and accessions of or to any of the foregoing." (Adv. D.I. 38 at ¶ 30.)

The Court agrees with WSFS and concludes that the description of collateral in its financing statement is sufficiently broad to provide inquiry notice of WSFS's possible security interest in the Disputed Goods. Allis-Chalmers Credit

21

Corp. v. Tri-State Equip., Inc. (In re Tri-State Equip., Inc.),
792 F.2d 967, 971 (10th Cir. 1986) (holding that a financing
statement need only put other creditors on notice of a possible
security interest in the collateral in question).

    Soffe argues, however, that the terms of the WSFS Security
Agreement itself demonstrate that WSFS's security interest does
not attach to the Disputed Goods because WSFS's collateral was
defined to include only property owned by the Debtors, and Soffe
retained title to the Disputed Goods pursuant to sections 1.02
and 2.01 of the WSFS Security Agreement.  Soffe additionally
cites the Debtors' representations and warranties in sections
3.01, 3.04 and 3.06 of the WSFS Security Agreement, wherein the
Debtors represent that they have "good and valid rights in, and
title to, the Collateral," that they own the Collateral "free and
clear of any Lien," and that they hold "Inventory on consignment
representing [only] an immaterial portion of total inventory for
sale."  Soffe contends that the language of the WSFS Security
Agreement demonstrates that the parties did not intend WSFS to
have a security interest in consigned goods because if they had,
the Debtors would have repeatedly breached their representation
that they owned the inventory and that there were no other
interests or liens on the collateral.  Further, Soffe contends
that there would be no reason to represent that consigned goods
were immaterial unless the intent was to exclude them from the

collateral pledged to WSFS.

Soffe relies on In re Salander-O'Reilly Galleries, LLC in arguing that the parties' intent was to grant WSFS a security interest only in property that was actually owned by the Debtors, not consigned property. Kraken Invs. Ltd. v. Jacobs (In re Salander-O'Reilly Galleries, LLC) (Salander II), No. 14 CV 3544 (VB), 2014 WL 7389901 (S.D.N.Y. Nov. 25, 2014), rev'g, Jacobs v. Kraken Invs. Ltd. (In re Salander-O'Reilly Galleries, LLC) (Salander I), 506 B.R. 600 (Bankr. S.D.N.Y. 2014).

In Salander I, the Liquidation Trustee under a confirmed chapter 11 plan objected to a proof of claim filed by the owner of a multi-million dollar Botticelli painting, which had been consigned prepetition to the Debtor. 506 B.R. 600. The Trustee objected to the proof of claim on the grounds that the owner of the painting had failed to perfect his interest and that the Trustee had a superior right as assignee of the Bank's perfected blanket lien. Id. The Bank had a perfected security interest in all of the Debtor's "personal and fixture property of every kind and nature including without limitation all goods (including inventory, equipment, and any accessions thereto) . . . and all products and proceeds to the foregoing." Id. at 605. The owner of the painting responded that the Bank's lien did not extend to goods that the Debtor held on consignment. Id. at 606. The Bankruptcy Court held (in denying cross-motions for summary

23

judgment) that there existed a genuine issue of material fact as
to whether the prepetition transaction by which the painting came
into the Debtor's possession constituted a "consignment" within
the meaning of the New York UCC:

> To be clear, the Court does not hold one way or
> the other that the transaction by which the Botticelli
> came into the Debtor's possession was or was not
> governed by Article 9 of the Uniform Commercial Code.
> Rather, the Court finds that, at the summary judgment
> stage, the Trustee has failed to offer any evidence
> from which the Court can conclude that the requirements
> of § 9-102(a)(20) have been met with respect to the
> transaction.

506 B.R. at 609.

Nonetheless, the Bankruptcy Court held that, under New York
rules of contract interpretation, the Security Agreement
unambiguously granted the Bank a lien in all of the Debtor's
inventory, including consigned goods.  Id. at 610.

The District Court reversed, holding that the "plain
meaning" of the unambiguous Loan Agreement granted only a limited
security interest, which attached only to property owned by the
Debtor and did not include consigned property.  Salander II, 2014
WL 7389901, at *3 ("[The Security Agreement] unambiguously
defines Collateral as property owned by [the Debtor], and
consigned artwork, by its very nature, is owned by its owner, not
the consignee.").

WSFS argues that the District Court's decision in Salander
II is inapposite here because the District Court did not consider

24

whether the consignment arrangement was governed by the UCC and
instead based its decision on state law.  WSFS argues that
because the Pay by Scan Agreement is governed by the UCC, the
Debtors would be deemed to have an interest in consigned goods
sufficient to grant a security interest to WSFS pursuant to
section 9-319(a).  Russell v. Mountain Nat'l Bank (In re
Russell), 254 B.R. 138, 141, 144 (Bankr. W.D. Va. 2000) (holding
that a security interest in "all the debtors' . . . inventory . .
. whether now owned or hereafter acquired" attached to inventory
supplied on consignment because the UCC "puts consignors at risk
to prior perfected secured parties of their mutual customers" and
"the statute should be applied as written."); Sensient Flavors,
LLC v. Crossroads Debt, LLC, No. 302323, 2013 WL 5857604, at *2,
*7 (Mich. Ct. App. Oct. 31, 2013) (explaining that "the UCC
allows a consignee to grant a security interest in property it
does not own" and holding that a security interest in "all
assets" included consigned goods in the consignee's possession);
Woven Treasures, Inc. v. Hudson Capital, LLC, 46 So. 3d 905, 915
(Ala. 2009) (holding that "owned inventory" included inventory
deemed to be owned by the retail store under the UCC); Excel Bank
v. Nat'l Bank of Kansas City, 290 S.W.3d 801, 806 (Mo. Ct. App.
2009) (holding that a party with a perfected security interest in
inventory had an interest in consigned goods senior to the
interests of the consignor who failed to file a financing

statement).

The Court agrees with WSFS and finds <u>Salander II</u> unpersuasive because the District Court did not address the issue of material fact (as to whether the consignment arrangement was governed by the UCC), which is before the Court in this case.  As the Court concludes above, the question of whether the UCC is applicable raises a disputed issue of material fact which precludes partial judgment on the pleadings.

IV.  <u>CONCLUSION</u>

Because there is a disputed issue of fact as to whether the Pay by Scan Agreement is governed by the UCC, the Court will deny WSFS's Motion for Partial Judgment on the Pleadings.

An appropriate Order follows.

Date:  March 6, 2017

BY THE COURT:

Mary F. Walrath
United States Bankruptcy Judge